# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>JOSHUA LAMBROS YIANNOS,<br><br>Debtor. | Bankruptcy Case No. 24-11232 TBM<br>Chapter 7 |
| JUSTIN OWENS and<br>AMANDA OWENS,<br><br>Plaintiffs,<br><br>v.<br><br>JOSHUA LAMBROS YIANNOS,<br><br>Defendant. | Adv. Pro. No. 24-01135 TBM |

## MEMORANDUM OPINION AFTER TRIAL

## I.   Introduction.

Bankruptcy provides a temporary safe haven for "honest but unfortunate debtor[s]"[1] so that they "can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[2]  The foundation of American insolvency law is the possibility of a discharge which provides a "fresh start" — an economic second chance which acts as a sort of safety valve in our capitalist system. However, not all debtors are entitled to a discharge.  The Bankruptcy Code[3] "has long prohibited debtors from discharging liabilities incurred on account of their fraud . . . ."[4] Those few debtors who engage in pre-bankruptcy dishonesty (including false pretenses, false representations, or actual fraud, fraud or defalcation while acting in a fiduciary capacity, or willful and malicious injury) must continue to bear responsibility for the damages resulting from their misconduct.

---

[1]   *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

[2]   *Grogan,* 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (internal quotation omitted)).

[3]   11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]   *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998).

This Adversary Proceeding arises from a construction contract gone awry. Creditors-Plaintiffs Justin Owens ("Dr. Owens") and Amanda Owens ("Mrs. Owens") (together, the "Owenses") own a residential property located in the Hilltop area of central Denver (the "Property").  They wanted to make major renovations to the Property to better accommodate their family.  So, in 2023, they sent out an open-ended inquiry on an internet website: Thumbtack.[5]  Debtor-Defendant Joshua Lambros Yiannos ("Yiannos"), a teenager still in high school, was one of only a few to respond to the Thumbtack invitation.  An enterprising eighteen year old who lived with his mother and had some limited experience on small construction projects for his family, friends, and church, Yiannos wanted to undertake the home improvement project for the Owenses through a limited liability company that he had just formed earlier in the year: Dream Home Renovations LLC ("Dream Home").  After some initial communications, Dream Home bid $345,910 for the work.  The Owenses promptly accepted.  To document their arrangement, on June 21, 2023, the Owenses and Dream Home entered into a "Home Improvement, Remodel, [and] Renovation Contract" (the "Contract").  The Contract provided for the Owenses to make a $171,290 deposit (the "Deposit").  Since Dream Home had no bank account, Yiannos asked the Owenses to pay the Deposit in separate installments to Yiannos personally and to his mother's company.  The Owenses did so.

The construction work on the Property did not go well.  Dream Home failed to obtain a building permit from the City and County of Denver Department of Planning and Development (the "Building Department").  The company hired a series of subcontractors to do most of the actual renovation work.  The arrangements were all oral with no real documentation.  Although significant work was performed, the quality of some of the renovations was not up to par — at least from the perspective of the Owenses.  Dream Home paid most of the subcontractors in cash with no formal accounting.  Some of the subcontractors asserted nonpayment and left the job early, thereby requiring replacement subcontractors.  Although, unusually, the Contract did not contain a completion date, the Owenses felt that the project was getting behind.  And, then, the Building Department placed a "Stop-Work Order" on the Property because of Dream Home's failure to obtain a building permit.  On October 17, 2023, the Owenses (through their legal counsel) declared a default, asserted construction defects, demanded return of unused and unearned funds, and terminated the Contract.  Dream Home stopped work but did not return any funds to the Owenses.  Unsatisfied, the Owenses sued Dream Home and Yiannos in the District Court for the City and County of Denver, Colorado (the "State Court").

On March 20, 2024, Yiannos filed for relief under Chapter 7 of the Bankruptcy Code, staying the litigation against him in the State Court pursuant to Section 362(a).  A few months later, on June 21, 2024, the Owenses filed a "Complaint Objecting to Discharge" (Docket No. 1,[6] the "Complaint") commencing this Adversary Proceeding.  In

---

[5]     *See* *www.thumbtack.com*.  Thumbtack characterizes itself as a "technology company helping millions of people confidently care for and improve their homes."

[6]     The Court will refer to documents filed in the CM/ECF docket for this Adversary Case, *Owens v. Yiannos (In re Yiannos)*, Adv. Pro. No. 24-1135 (Bankr. D. Colo.) citing to "Docket No.___."  At times the Court will also refer to documents filed in Yiannos' Main Bankruptcy Case, *In re Yiannos*, Case No. 24-

the Complaint, the Owenses assert that Yiannos misappropriated funds from the Owenses. They seek a determination that the debt allegedly owed to them by Yiannos by virtue of such misappropriation is excepted from discharge pursuant to Sections 523(a)(2)(A) ("false pretenses, false representations, or actual fraud"), (4) ("fraud or defalcation while acting in a fiduciary capacity" and larceny), and (6) ("willful and malicious injury"). Yiannos filed an answer in which he denies the Owenses' claims.

Accordingly, this dispute requires the Court to decide: (1) whether Yiannos owes a debt to the Owenses and, if so, how much; and (2) whether such debt is nondischargeable under Sections 523(a)(2)(A), 523(a)(4), and/or 523(a)(6). The Court conducted a trial during which Yiannos and Dr. Owens testified. The Court also admitted exhibits into evidence. Having considered the facts and the law, and for the reasons set forth below, the Court determines that the Owenses failed to satisfy their burden of proof. Accordingly, any debt allegedly owed by Yiannos to the Owenses is dischargeable in bankruptcy.

## II.    Jurisdiction and Venue.

The Court has jurisdiction to enter final judgment in this nondischargeability dispute pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate); and (b)(2)(I) (determinations as to the dischargeability of particular debts). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. The Owenses and Yiannos agree that this Court has jurisdiction to enter judgment and that venue is proper in the Court. (Compl. ¶¶ 6-8; Ans. ¶¶ 6-8.)

## III.    Procedural Background.[7]

## A.    Yiannos' Main Bankruptcy Case.

On March 20, 2024, Yiannos filed for liquidation under Chapter 7 of the Bankruptcy Code. He submitted a Voluntary Petition, Statement of Financial Affairs, Schedules A-H, and other related documents showing a bleak financial picture. (Main Case Docket No. 1.) Per his Statement of Financial Affairs, Yiannos earned just $2,812 in 2023 and nothing in 2024. (*Id*. at 8-9.) According to his Schedules, Yiannos listed assets of just $15,966 (all of which he asserted as exempt) against debts of approximately $250,329. (*Id*. at 15-30.)

In Schedule E/F, Yiannos identified the Owenses as holding an unsecured claim in the amount of $175,000.00 for "business debt" and indicated that the debt was "contingent," and "disputed." (*Id*. at 26.) Yiannos identified his mother as his second

---

11232 (Bankr. D. Colo.) (the "Main Case"). When doing so, the Court will refer to documents filed in the CM/ECF docket for the Main Case by citing to "Main Case Docket No. _____."

[7]    The Court takes judicial notice of the docket in this Adversary Proceeding as well as in the Main Case. *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).

largest creditor.  (*Id*.)  On April 23, 2024, the Chapter 7 Trustee in the Main Case, Jeanne Y. Jagow, filed a "Report of No Distribution," in which she stated that she had made a diligent inquiry into the financial affairs of Yiannos and there is no property available for distribution from the estate over and above that exempted by law.  As a result, no creditors filed proofs of claim and the Court entered a general "Order Discharging Debtor" (Main Case Docket No. 22) on August 12, 2024.  The Court closed the Main Case on September 18, 2024.

**B.      The Adversary Proceeding.**

On June 21, 2024, the Owenses timely commenced this Adversary Proceeding by filing the Complaint.  In the Complaint, the Owenses contend that Yiannos is indebted to them by virtue of his alleged misappropriation of the $171,290 Deposit.  The Owenses asserted three claims:

- "First Cause of Action:  Denial of Discharge — 11 U.S.C. § 523(a)(2)(A)";

- "Second Cause of Action:  Denial of Discharge — 11 U.S.C. § 523(a)(4)"; and

- "Third Cause of Action:  Denial of Discharge — 11 U.S.C. § 523(a)(6)."

On July 22, 2024, Yiannos filed an "Answer" contesting the Complaint. (Docket No. 4, the "Initial Answer.")

Thereafter, the Court set the matter for a pretrial scheduling conference.  (Docket No. 5.)  On August 22, 2024, the Court held the pretrial conference during which the Owenses and Yiannos confirmed their consent to this Court's jurisdiction to adjudicate all claims and defenses in this Adversary Proceeding.  In addition, the Court granted Yiannos' oral motion to amend the Initial Answer.  (Docket No. 9.)  On September 17, 2024, Yiannos filed an "Amended Answer to Complaint Objecting to Discharge" (Docket No. 13, the "Amended Answer"), a "Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted Pursuant to Fed. R. Bankr. P. 12(b)(4) and Fed. R. Bankr. P. 7012, or Alternatively, Motion for More Definitste [sic] Statement Pursuant to Fed. R. Civ. P. 12(e)" (Docket No. 14, the "Motion to Dismiss"), and a "Memorandum of Law in Support of Defendant's Motion to Dismiss" (Docket No. 15).  The Amended Answer is the operative defensive pleading.  In the Motion to Dismiss, Yiannos sought dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and (e).  On September 20, 2024, the Court denied the Motion to Dismiss.  (Docket No. 16.)

On November 6, 2024, Yiannos filed a "Motion for Summary Judgment" (Docket No. 18, the "Summary Judgment Motion") seeking summary judgment on all of the claims asserted by the Owenses in the Complaint.  Thereafter, the Owenses filed their "Response to Defendant's Motion for Summary Judgment" (Docket No. 24, the "Response") and Yiannos filed his Reply (Docket No. 25).  On April 24, 2025, the Court denied the Summary Judgment Motion.  (Docket No. 31).

The Court conducted a trial on the Complaint and Amended Answer on May 5, 2025. At the trial, the Court heard opening statements from counsel for the Owenses and counsel for Yiannos, followed by the testimony of two witnesses: Dr. Owens and Yiannos. The Court also admitted Plaintiff's Exhibits 1-10 into evidence. After the close of evidence, the Court heard fulsome closing argument from counsel for the Owenses and Yiannos. The Court, having considered the evidence presented at trial (including the testimony and admitted exhibits) and the arguments presented by the parties at trial and in their legal briefs, determines that the dispute is ripe for decision.

## IV.   Findings of Fact

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, based upon the evidence presented at the trial (including testimony and admitted exhibits) along with the Stipulated Facts presented by the parties. (Docket No. 30.) To the extent that the Court's identification of the foregoing Procedural Background is factual in nature (that is identifying what occurred in the Main Case and this Adversary Proceeding), the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

## A.   Yiannos and Dream Home.

The Defendant, Yiannos, is a young, unmarried teenager. He has no children. At all times relevant to this Adversary Proceeding, he lived with his mother. When Yiannos reached the age of 14 years old, he developed an interest in the building industry; he started doing odd construction jobs. He testified about his experience:

> Prior to the business and stuff [in 2023], I did stuff for, like friends, families, churches and other people who needed some work done, probably for about for four years and then stuff on our property [his mother's home] a bit longer.

Yiannos did get paid for his work as a young builder. In any event, he graduated from high school in 2024. (Ex. 5 at 2.) Yiannos received no further formal education.

While in high school, Yiannos decided to form his own construction company: Dream Home. Dream Home is a Colorado member-managed limited liability company organized by Yiannos during early January 2023. Yiannos was the only member of Dream Home during its short existence. The company never had any employees and never had a business bank account. Dream Home performed about 10-15 small projects between January and June 2023. Per Yiannos, the jobs consisted of bathrooms, kitchens, flooring, baseboards and doors "pretty much like same kind of stuff. All remodeling stuff; some plumbing, electrical, HVAC, cabinet refinishing, paint and stuff like that." Mostly, Dream Home used subcontractors to do the actual construction work. By the time of trial, Dream Home has ceased doing business. Yiannos testified that he is planning to go into military service as a new career given his unsuccessful foray into construction.

5

Yiannos was never a licensed general contractor.  He had no formal instruction in the construction trade.  In fact, he had no construction qualifications other than the experience he had pieced together during the four years he had spent working on the construction projects when he was 14-18 years old.  Until the commencement of this Adversary Proceeding, Yiannos had no knowledge of the Colorado Trust Fund Statute, COLO. REV. STAT. § 38-22-101 *et seq.*, a key statute governing construction contracts and projects.

At this point, the Court departs from the specifics of Mr. Yiannos' background testimony to make some overall factual findings regarding Mr. Yiannos.  Mr. Yiannos presented as an extremely young person.  Although he was 19 years old by the time of the trial, he certainly looked much younger.  The Court found him to be earnest and credible — but very obviously inexperienced and naïve regarding business and the construction industry generally.  Yiannos used the phrase "and stuff" repeatedly throughout his sworn testimony as a sort of immature mantra.  He expressed sincere regret that Dream Home was not able to complete the construction work for the Owenses and wished that he could make it right.

**B.**    **The Owenses, the Property, and the Renovation.**

Justin Owens and Amanda Owens are husband and wife.  Dr. Owens is an orthodontist who has practiced his profession for more than 17 years.  The Owenses have three children.  Their children are ages 16, 15, and 10 years old.  (So their oldest child is about 2-3 years younger than Yiannos.)  Together, the Owenses own the Property, which is a personal residence located in the Hilltop area at 36 South Hudson Street, Denver, CO 80246.

During approximately 2023, the Owenses decided that they wanted to undertake a major renovation of the Property.  The Owenses initially envisioned a project in two phases.  In the first phase, they wanted to renovate their living room, add a new fireplace, remodel their kitchen, renovate some bathrooms, resurface the floors, and reconfigure one bathroom into two bathrooms.  In the second phase, they envisioned taking down the back wall of their kitchen and expanding it eastward into their yard.

**C.**    **The Initial Contact Between the Owenses and Yiannos.**

To find a construction contractor for the project the Owenses envisioned, the Owenses turned to an internet application: Thumbtack.  *See www.thumbtack.com.*  Thumbtack characterizes itself as a "technology company helping millions of people confidently care for and improve their homes."  Dr. Owens put it this way:

> [Thumbtack] is an app through which you can find different
> types of professionals for house jobs such as plumbing,
> electrical, remodeling kitchens and remodeling bathrooms
> . . . .  You describe your project and then different
> contractors and professionals will reach out with their bids.

6

Since Dr. Owens had not used Thumbtack much, Mrs. Owens took the lead in using Thumbtack to find construction help. Mrs. Owens described the proposed work on Thumbtack and solicited responses. Yiannos was "one of the few" to respond to the Thumbtack invitation. He reached out and indicated he was interested in doing the job.

In approximately June 2023, Yiannos met the Owenses at the Property. The Owenses and Yiannos initially discussed only the addition of a fireplace. But then the Owenses raised "some of the other things [they] were looking to do." Yiannos volunteered that he had his own business, Dream Home, and would be capable of doing "everything" described by the Owenses. Again, at that point, Yiannos was still in high school. He graduated in 2024, so he must have been trying to engage in construction activities for the summer.

**D.** **The Contract.**

Subsequent to their initial meeting in approximately June 2023, Yiannos prepared the Contract, which is dated June 21, 2023, and contains a bid for renovation work for the Owenses. (Ex. 1.) Other than the initial meeting, the Court received no evidence that Yiannos met with the Owenses again before they signed the Contract.

The Contract is quite unusual and unprofessional, perhaps befitting the drafter's still being in high school. It starts this way:

> ## Home Improvement, Remodel, Renovation Contract
>
> **This Contract is between:**
>
> Dream home Renovations LLC. **24600 E Alameda Ave, Aurora, Colorado 80018, 7203343577 (the "Owner"), Joshua Yiannos Huckabay, (the "Contractor") and**
>
> **(HOMEOWNER)**
>
> Amanda and Justin Owens
>
> **OF Project Address:  36 south hudson st.  denver 80246**

(Ex. 1.) So, "Dream home Renovations LLC" is defined as the "Owner." Then, "Joshua Yiannos Huckabay" is defined as the "Contractor." And, there is no definition for the Owenses although their names are listed under "HOMEOWNER." This is all quite odd because "Dream home Renovations LLC" plainly is not the "Owner" of the Property; the Owenses are. And, based upon the testimony at trial, it appears that Dream Home was the "Contractor"; not Yiannos. In any event, the Contract lists a "Project Description":

**Project Description:**

**- full addition with big sliding door**

**- building new upstairs laundry room**

**- adding walkout door in laundry room**

**- full new kitchen**

**- custom linear gas fireplace with built in shelving**

**- custom bar area on wall with arch**

**- sons room full new bathroom and new closet**

**- daughters room brand new** bathroom with **tub shower combo.**

**- brand new guest bathroom**

**- full new master bathroom with** master shower **with separate toilet**

**- full hardwood floor refinish on main level**

**- full level 5 finish on upstairs main area**

**- new recess lighting in entire house.**

**- new electrical updates to house**

**- full new stair build to basement up to code with custom real wood treads to match upstairs.**

**- full new paint on intirior of home**

**- adding door to current laundry room in basement**

**- framing off window**

**- full new downstairs bathroom**

Hereinafter, the Court will refer to the foregoing work to be performed under the Contract as the "Project." Obviously, the scope of the Project was far more extensive than what the Owenses initially envisioned. Among other things, the Project included a "full addition"; a new "laundry room"; a "full new kitchen"; a new fireplace; five new bathrooms; refinishing floors; repainting; and a host of other construction tasks. The Project morphed into a very major whole-house remodel.

In any event, after describing the Project, the Contract contains the following payment terms:

**Payment.** Payment shall be made to Joshua Yiannos Huckabay, Aurora, Colorado 80018.

Dream Home   Renovation LLC agrees 100% of all materials are to be payed and ready to go on site before work starts,  **50% of the total labor cost is due at the start of the project, 25% of total payment when 75% of the project is completed. And the last 25% when the walk through is done and the home owner approves.**

Total Payment for Job Including materials and labor. Total = $345,910

 due at the start of work.Total =$171,290

**(Homeowner signature)**

I Amanda agree..

that payments will be made consistently with 100% materials 50% labor  at start of project before it begins. 25% of total payment when 75% of the project is completed. And the last 25% when the walk through is done and the home owner approves.

**(Contractor signature)**

In addition to any other right or remedy provided by law, if **(HOMEOWNER) Amanda Owens.**

fails to pay for the Services when due, ... me Renovations LLC has the option to treat such failure to pay as a material breach of this **Contract**, and may cancel this **Contract** and/or seek legal remedies.

100% materials 50% upfront labor, 25% after 75% of the project is completed and remaining 25% balance upon completion of work.

The foregoing is all quite strange.  Although Dream Home is the party to the Contract, payments are to be directed to Yiannos personally.  Why?  The Contract does not say; but based upon testimony at trial, it appears that Dream Home did not have a bank account.  Then, there is a sort of sentence fragment for "Amanda."  "Amanda" apparently was supposed to sign the middle of the Contract herself but without Dr. Owens.  Why?  The Court does not know.

In any event, at least the Contract identified the "Total Payment:  $345,910." And, the Contract provided for an initial payment "due at the start of work" of $171,290 (*i.e.*, the Deposit).  The Deposit amount does not match the text of the Contract.  The Contract references an "upfront" payment of "50% labor"; "50% of the total labor cost is due at the start of the project"; "50% labor at start of project before it begins"; and "50% upfront labor."  But the Contract does not include any breakdown of the amount of labor costs for such calculation.  Instead, based upon the amount of the Deposit, it appears that the parties agreed to an initial payment of 50% of the "Total Payment."  But there was an obvious math error.  The Deposit ($171,290) was not actually 50% of the "Total Payment."  Half of the $345,910 "Total Payment" equates to $172,955; not $171,290. So, the payment terms were not internally accurate and consistent.

In any event, after the foregoing, Yiannos appears to have appended a generic set of "Terms and Conditions." Many of the Terms and Conditions do not match with the text of the Contract or the context. For example, the Contract states that: "Contractor shall commence work under this Contract on or before 06/25/2023." But, the Contract was not executed until July 3, 2023. Section 5 of the Terms and Conditions governs "Hazardous Materials" and provides that if hazardous materials are encountered, the Contractor "shall stop work immediately and notify the Owner who may then retain a qualified Contractor to perform the work. Such work shall be considered Extra Work under Paragraph 13." But the Contract does not contain any "Paragraph 13" dealing with "Extra Work." Section 8 of the Terms and Conditions refers to "Specifications" in the Contract. But, the Contract has no "Specifications."

There are other unusual features of the Contract. The Terms and Conditions skip from Section 17 (Notice) to Section 27 (Integration Clause) to Section 19 (Corrective or Repair Work.) There is no Section 18. The Terms and Conditions are replete with spacing gaps. The Contract contains numerous misspellings, including: "intirior" instead of "interior"; "payed" instead of "paid"; "manufacturers" instead of "manufacturer's."

Notably, the Contract did not include many standard provisions for construction remodeling contracts. Among other things, the Contract: (1) did not address licensing, bonding, or insurance; (2) failed to contain a completion or estimated completion date; (3) did not include any specifications, design specifications, plans, drawings or blueprints even though the Contract contemplated a "full addition" and multiple new rooms; (4) failed to address the retention of an architect for the additions; (5) did not include provisions regarding the possible use of subcontractors and subcontractor liens; and (6) failed to address required construction permitting.

In any event, with seemingly no inquiry or negotiation, the Owenses executed the Contract as "Homeowners" on July 3, 2023. Under the heading "Dream Home Renovations LLC," Yiannos also signed the Contract (through a DocuSign electronic signature.) The Court finds that Dream Home and the Owenses were the parties to the Contract.

## E.   <u>Pre-Contract Representations, Due Diligence and Inquiry</u>.

Per Dr. Owens, at some stage (exactly when was unclear in Dr. Owens' testimony), Yiannos stated that he was a licensed general contractor who was bonded and insured and that his company could perform the Project. Dr. Owens swore that he and his wife would not have hired Yiannos if he was not "licensed, bonded, and insured." The Court admitted into evidence Exhibit 10, which is an undated text message (the "Text Message"). The Text Message states: "We are licenced [sic] insurerd [sic] and bonded." (Ex. 10.) The Text Message does not clarify who "we" is. But, Yiannos admitted that he sent the Text Message to the Owenses. The evidence shows that Yiannos misspelled several of the key words — "licenced" and "insurerd" — in the six-word Text Message. It was a very unprofessional start. But, the Text Message supports Dr. Owens' testimony. The Court finds that Yiannos advised the

Owenses that "[w]e are licenced [sic] insuerd [sic] and bonded" and capable of performing the Project.

Yiannos testified that in making the representation about being licensed and bonded, he did not mean to suggest that *he* or *Dream Home* were licensed or bonded, because neither he nor the company had a license or bond. Instead, Yiannos subjectively thought the representation was accurate because his company used Michelle,[8] a person who did have a general contractor license from the Building Department, to "pull" building permits. And, Yiannos fully anticipated using licensed subcontractors as well. The Court accepts that the foregoing was Yiannos' subjective understanding and intent. Yiannos later admitted that he "could have been more clear" that Dream Home did not have a licensed general contractor but expected to retain one.

Prior to executing the Contract, the Owenses engaged in almost no due diligence or inquiry. They did ask Yiannos for references, which Yiannos provided. The Court received no information regarding the number or character of the references. In any event, the Owenses did not follow up with any of the references. During their initial meeting, Yiannos also showed the Owenses some photographs of other construction projects that he had worked on. The Court received no information regarding the specifics of such photographs, such as the number of projects or type of construction work shown in the photographs. At some point, Yiannos showed the Owenses some evidence of insurance. The Court received no information about the specifics. Therefore, the Court finds that, other than receiving Yiannos' representation that "[w]e are licenced [sic] insuerd [sic] and bonded" and capable of performing the Project, receiving some references, and viewing some photographs and an insurance document, the Owenses did absolutely no other inquiry or due diligence before entering into the Contract.

Although, apparently, Dr. Owens thought it was important that Yiannos or Dream Home be licensed, bonded and insured, the Owenses did not ask for or receive a copy of a general contractor's license or a bond. They did not request or receive Yiannos' resume or list of projects. They did not ask his age, although Yiannos was only 18 at the time and appears younger than his age. They did not take the simple step of contacting any references. Dr. Owens was unsure whether the Owenses had reviewed any comments about Yiannos on Thumbtack or any other internet source. The Owenses did not contact the Building Department to verify licensure. They did not check with the Colorado Secretary of State to see how long Dream Home had been in business. They did almost nothing.

When presented with the Contract, which obviously was unprofessional and error-ridden, the Owenses did nothing to make further inquiry about the capabilities and qualifications of Yiannos and Dream Home. They did not ask for standard representations about licensure, bonding, and insurance to be included in the Contract. They did not question the strange identification of parties in the preamble of the Contract. They did not explore why payments were supposed to be directed to Yiannos personally. The Owenses did not consider the mathematical miscalculation of the

---

[8]        Yiannos was not certain, but believed that Michelle's last name is "Estravas."

Deposit.  They did not question all the misspellings, spacing gaps, and misnumbering in the Contract.  They did not make inquiries regarding the lack of any specifications, design specifications, plans, drawings or blueprints even though the Contract contemplated a "full addition" and multiple new rooms.  The Owenses did not ask to include permitting representations in the Contract.  They did not engage counsel to review the proposed Contract even though the amount at issue was very substantial: $345,910.  All of the foregoing issues in the Contract (or not in the Contract) should have raised giant red flags for the Owenses.  But, they did nothing.  In fact, the Court received no evidence that Yiannos and the Owenses ever met after their initial meeting and before they executed the Contract.

There was another issue that should have raised the need for inquiry or due diligence.  Prior to the execution of the Contract, Yiannos asked that the Deposit be paid early.  He instructed the Owenses to pay him personally $146,290 and to pay "Murphy Creek Ranch" $25,000.  On June 28, 2023, the Owenses issued three checks which were negotiated the next day: (1) Check No. 5 for $100,000 payable to Yiannos; (2) Check No. 6 for $46,290 payable to Yiannos; and (3) Check No. 7 for $25,000 payable to Murphy Creek Ranch.  (Exs. 2-4.)  The Owenses did not know anything about Murphy Creek Ranch or its involvement — and they did not ask.  Murphy Creek Ranch is owned by Yiannos' mother.  Yiannos testified that he directed payment (effectively to his mother) because Dream Home did not have a bank account and there were "problems with depositing funds into my account."  (Ex. 7.)  The Owenses never questioned the early payments, the payments directly to Yiannos rather than Dream Home, nor the payments to Murphy Creek Ranch.  If they had done so, they likely would have learned that Dream Home did not have a bank account and Murphy Creek Ranch with an unrelated entity owned by Yiannos' mother.

## F.  <u>Work on the Project</u>.

Work on the Project started in June 2023, the summer before Yiannos graduated from high school.  The Owenses continued to live in the Property during the Project, so they were able to observe firsthand much of the work being performed by Yiannos and the Dream Home subcontractors.  Though Yiannos did some minimal work, such as framing the closet in the Owenses' son's bathroom, Dream Home or Yiannos hired subcontractors to provide the majority of the services required for the Project because Dream Home had no employees.  Dream Home did not enter into any written contracts with the subcontractors.  Instead, strangely, all arrangements with subcontractors were strictly on an oral basis.  (Ex. 5 at 5.)  None of the subcontractors presented Dream Home or Yiannos with written estimates or invoices.  (*Id*.)  Yiannos often paid the subcontractors in "cash and stuff."

The Project got off to a quick start with demolition.  But after the initial demolition work, the Project went slowly.  When the Owenses questioned the progress, Yiannos "always had excuses."  He often blamed the subcontractors.  And, the subcontractors blamed Yiannos.  Several subcontractors told the Owenses that Yiannos was not paying them.  Some of the subcontractors left the Project and had to be replaced.  When new subcontractors started, they would complain to the Owenses about the quality of the work done by the prior subcontractors and indicate they needed to start

12

over.  The Owenses encountered two subcontractors waiting on their doorstep at the Property asking the Owenses where their money was.  Regardless of the indications that subcontractors were not being paid (or at least not being timely paid), no subcontractors filed mechanics liens against the Property.  And, no subcontractors testified at the trial that they were owed money for their work on the Project.

Notwithstanding, Dream Home (through Yiannos and the subcontractors) performed significant work on the Project.  However, the Owenses thought that the quality of at least some of the work was substandard.  Dr. Owens identified the plumbing in the Owenses' daughter's bathroom and the tile work in their son's bathroom as trouble spots.  The plumbing was improperly run through floor joists and the slope of the drainage was not right.  The tile work was amateur looking and sloppy.

During October 2023, Dr. Owens came home from his orthodontic practice and found a stop-work order posted on front the door of the Property.  The stop-work order was not admitted into evidence.  However, per Dr. Owens' testimony, the stop-work order commanded the Owenses to stop all construction work at the Property due to their not having obtained a building permit.  The stop-work order also set a deadline by which the Owenses were required to secure the building permit, failing which fines would accrue.  Dr. Owens gave the stop-work order to Yiannos.  Yiannos indicated that subcontractors had obtained electrical and plumbing permits.  However, he acknowledged that Dream Home had not secured a building permit.  Yiannos (who himself was not a licensed general contractor) tried to engage several licensed general contractors to "pull" a building permit.  However, none of the five licensed general contractors contacted by Yiannos agreed to join the Project.  As a result, Dream Home never secured the required building permit for the Project.

Ultimately, because of the Owenses' concerns over poor quality work, the stop-work order, and Dream Home's failure to obtain a building permit for the Project, the Owenses engaged legal counsel.  On October 17, 2023, the Owenses (through their legal counsel) declared a default, asserted construction defects, demanded return of unused and unearned funds, and terminated the Contract.  (Ex. 9.)  Dream Home stopped work but ultimately did not return any funds to the Owenses.

**G.    Post-Termination Events.**

After termination of the Contract, some efforts were made to resolve the dispute over the Contract.  On January 4, 2024, Yiannos sent the Owenses a text stating:

> Hey justin and amanda.  I wanted to reach out to you guys. I'm still recovering from surgery.  but I wanted to see if you guys would like to meet sometime so we can go over everything.  And try to get everything worked out.

(Ex. 6.)  Dr. Owens responded:

Can you help us understand what you want to "work out"?
Honestly, unless you have a check for $100,000 that you are
ready to deliver, we are going to let our lawyer handle this.

(*Id*.)  No meeting occurred.

On January 11, 2024, Dream Home provided the Owenses with a notarized "Affidavit of Joshua Yiannos" (the "Affidavit"), a spreadsheet (the "First Spreadsheet"), and financial records included some redacted bank account statements, checks and screenshots of Venmo transfers.  (Ex. 7.)  In the Affidavit, Yiannos swore and affirmed "under penalty of perjury" that the information contained in the Affidavit, including representations regarding the contents of the First Spreadsheet, was "true and accurate."  The First Spreadsheet listed four bank accounts:

(1)     a "Canvas Business Checking" Account No. xxxxxxx578 (formerly Account
        No. xxxxxx284) ("Account No. 578");

(2)     a "Canvas Personal Checking" Account No. xxxxxxx835 ("Checking
        Account No. 835");

(3)     a "Canvas Personal Savings" Account No. xxxxxx835 ("Savings Account
        No. 835"); and

(4)     a "US Bank Personal Checking" Account No. xxxxxxx6964 (Account No.
        6964").

Additionally, the First Spreadsheet listed certain "Venmo" transactions.

In the Affidavit, Yiannos explained that Account No. 578 is an account of Murphy Creek Ranch and that he is a co-signer.  Murphy Creek Ranch is an entity owed by Yiannos' mother.  The Owenses had paid $25,000 of the Deposit into Account No. 578. Checking Account No. 835 is one of Yiannos' mother's accounts.  Savings Account No. 835 is one of Yiannos' mother's accounts.  Finally, Account No. 6964 also is another of Yiannos' mother's bank accounts.  Yiannos did not produce bank accounts statements for himself personally or for Dream Home.  After each listed account, Yiannos identified transfers into and out of the accounts, including deposits, checks, and other transfers.

With respect to Account No. 578, Yiannos listed an "Owens Check Deposit" in the amount of $25,150.00,[9] followed by a series of transfers out of the account, totaling $23,122.94, identifying the recipient of each transfer and sometimes the purpose. Yiannos identified seven transfers by check to individual subcontractors in the aggregate amount of $13,830.  Yiannos also provided copies of the checks.  Yiannos withdrew approximately $8,767 from Account No. 578 in cash as verified by the bank account statements.  Yiannos testified orally and through the Affidavit that he used the cash for purposes of the Project, although there is no documentation to support such

---

[9]     This is strange, since the Court received into evidence copies of all the checks that comprised portions of the Deposit, and no check in the amount of $25,150.00 was included.

testimony.  The balance of the transfers were to Home Depot.  With respect to Checking Account No. 835, Yiannos listed $2,268.79 as transferred to materials suppliers: mainly Home Depot.  The transfers were made by Debit Card withdrawals and are confirmed by the bank account statements.  With respect to Savings Account No. 835, Yiannos listed $9,900 of transfers.  All the transfers were made to Yiannos in cash withdrawals.  Yiannos testified orally and through the Affidavit that he used the cash for purposes of the Project, although there is no documentation to support such testimony.  With respect to Account No. 6964, Yiannos listed $7,425.53 of transfers.  Most of the transfers were made by Venmo to three subcontractors.  The balance of the transfers were to Home Depot and other suppliers of materials.  Finally, with respect to the Venmo transactions, Yiannos listed $4,450 in transfers mostly to himself, but also to a subcontractor.  Yiannos testified orally and through the Affidavit that he used the cash for purposes of the Project, although there is no documentation to support such testimony.  The transfers are verified by Venmo screen-shots.  However, the Court does not know the source of the funds.  Thus, in the First Spreadsheet and Affidavit, Yiannos asserted that Dream Home spent $47,167.26 on the Project.

Subsequently (the Court does not know when), Yiannos provided the Owenses with a different spreadsheet (the "Second Spreadsheet") purporting to account for use of the Deposit.  (Ex. 8.)  The Second Spreadsheet listed $138,296.96 worth of expenses which Yiannos claims he paid in connection with the Project, and lists $32,993.04 as an "Amount Owed to Client."  Yiannos did not provide any documentary support with the Second Spreadsheet (although a subset of the transactions listed on the Second Spreadsheet had been identified earlier in the First Spreadsheet for which some documentary support was provided).  At least one transaction listed on the Second Spreadsheet was overstated: a charge of $7,913.39 for Home Depot on August 11, 2023.  That same charge was listed as $791.39 (along with supporting documentation) on the Initial Spreadsheet.  So, the Second Spreadsheet overstates they alleged expenses by at least $7,122.  Yiannos concedes this was an error.  Another reason for the lack of supporting documentation for the Second Spreadsheet is that Yiannos paid many of the subcontractors in cash with no records.  He testified that "sort of lost track of the cash" paid to subcontractors.

Despite acknowledging that Dream Home owed $32,993.04 to the Owenses in the Second Spreadsheet, neither Dream Home nor Yiannos returned such funds to the Owenses.  Yiannos testified orally and in writing that "the money was stolen by subcontractors."  (Ex. 5 at 6.)  He identified subcontractors David Munoz and Damien Ortiz as having stolen funds.  Yiannos thought about suing the subcontractors to recover the stolen funds; however, Yiannos did not have the addresses and telephone numbers of the subcontractors.  (With respect to many of the subcontractors, Yiannos does not even know their last names.)  (Ex. 5 at 4.)  In any event, Yiannos swore repeatedly that he was only paid $2,500 for all of his work on the Project (which amount is consistent with his Statement of Financial Affairs).  And, neither he nor Dream Home (which is now defunct) has any money to pay the Owenses.

Eventually, the Owenses sued Dream Home and Yiannos in the State Court in the case captioned: *Owens v. Yiannos and Dream Home Renovation LLC*, Case No. 24-CV-30275 (District Court, City and County of Denver) (the "State Court Action").  The

Owenses did not assert a claim for violation of the Colorado Trust Fund Statute: COLO. REV. STAT. § 38-22-101 *et seq*. The Owenses did not sue any subcontractors because no subcontractors asserted mechanics' liens against the Property.

**H.**     **The Amount of Work Performed on the Project.**

The Owenses and Yiannos both concur that Dream Home, Yiannos, and/or the subcontractors performed a significant amount of work on the Project (albeit that the Owenses characterize most of the work as substandard). Yiannos testified that the following work was at least partially completed when the Contract was terminated:

- The new basement bathroom as 95% completed.

- The window framing was 100% completed.

- The new upstairs laundry was 50% completed.

- The new fireplace was 100% completed.

- The drywall was 50% completed.

- The new custom bar was 80% completed.

- The new bathroom (son's room) was 60% completed.

- The new guest bathroom was 40% completed.

- The floor refinishing was 100% completed.

- The electrical work was "mostly done."

Yiannos testified that, on an overall basis, Dream Home had completed about 45-50% of the entire Project at termination at a value of $170,000 or more. The Court received no contrary evidence.

**I.**     **Damages.**

The Owenses paid the $171,290 Deposit. Notwithstanding the lack of a building permit, Dream Home and Yiannos (through subcontractors) performed about 45-50% of the Project as detailed in the Contract. Yiannos has acknowledged that he and/or Dream Home owe the Owenses at least $40,115.04 (which amount is set forth on the Second Spreadsheet as "Amount Owed to Client" with the agreed $7,122 correction).

After the termination of the Contract, the Owenses retained another building contractor to "fix and repair" some of the allegedly substandard work performed by Dream Home and Yiannos as well as complete a more limited scope of the Project. The Owenses provide no specific testimony or documents regarding the reduced scope of the new work. And the Court received no testimony from the new building contractor

16

either.  Apparently, the new work was completed.  Dr. Owens testified that the Owenses paid "roughly $250,000 all in" to complete the more limited scope of the Project.  That calculation includes the $171,290 Deposit under the Contract plus an additional "approximately $70,000."  In his testimony, Dr. Owens was asked:  "So the difference is approximately $70,000 more than the $170,000 you paid."  He answered: "Correct." The Owenses provided no documentary support for any of such damages testimony. However, the Court accepts that the Owenses paid the $171,290 Deposit and then an additional $70,000 for some additional work.  That tallies to about $241,290, which is far less the amount in the Contract with Dream Home for the whole Project: $345,910. Based upon the foregoing, the Court has no way of knowing how, if at all, the Owenses have been damaged and in what amount based upon the replacement building contractor's repairing the allegedly substandard work and completing a reduced scope of the Project.  After all, the reduced scope of the Project was completed for an amount far less than the amount which would have been required for completion of the full Project scope.  Nevertheless, Yiannos had admitted through the Second Spreadsheet that the Owenses were owed the adjusted amount of at least $40,115.04.

**J.   <u>Final Findings</u>.**

The facts in this case are very unusual.  With little to no diligence or investigation, the Owenses entered in a Contract for $345,910 worth of construction remodeling work on the Property with a newly created entity (Dream Home) formed and controlled by a high schooler.  The Contract terms were high school level — at best.  The Court assesses that Yiannos was entrepreneurial and well-meaning.  Despite his rather obvious lack of experience, Yiannos thought he could complete the Project even though it was magnitudes larger than anything he had ever done before.  He told the Owenses that "[w]e are licenced [sic] insurerd [sic] and bonded" and capable of performing the Project.  That was wrong; but Yiannos thought it was right since he had some construction experience and anticipated hiring a licensed and bonded general contractor.  Yiannos wanted to finish the Project.

But, as might be expected of a high schooler, Yiannos was naïve and borderline incompetent as a businessperson (presumably trying to do his work during summer and after school).  The Contract was completely amateur and left out critical features. Unfortunately, Yiannos hired subcontractors only an oral basis and with no documentation.  He did not know some of their last names.  And, he paid most of the subcontractors in cash with no documentation.  Some of the subcontractors took advantage of him.  Yiannos' accounting was effectively non-existent while on the job. He lost track of the cash payments.  He was overwhelmed.  And, he did not ever secure the building permit required to perform the Project.

Yiannos is sorry that he did not get to finish the Project.  He thought he could. He never intended to take the Owenses' money and abscond with it or not do the work required under the Contract.  He has no ill will toward the Owenses.  He did not intend to hurt or harm them.  However, at the end of the day, the Deposit is gone and the Project was not completed by Dream Home.

The Court finds Yiannos' testimony that he used all of the Deposit only for the Project (except a $2,500 payment to himself for his services) but cannot properly account for details of the expenses with specificity and documentation credible albeit unsupported with documentation.  The Court determines that Yiannos was an inexperienced and well-meaning teenager who was out of his element and in over his head.  The Court also assesses that Dream Home and Yiannos breached the Contract — if for no other reason than that they failed to obtain the building permit required to lawfully complete the Project.  The Court finds Dr. Owens' testimony credible too.  In fact, there were no material conflicts in the evidence as between Dr. Owens and Yiannos.

## V.   Legal Analysis and Conclusions.

### A.   General Legal Framework.

#### 1.   Statutory Text.

The bankruptcy statutes relied upon by the Owenses in the Complaint (Section 523(a)(2)(A), (a)(4), and (a)(6)) provide:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt —  . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
>    (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or] . . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

#### 2.   Burden of Proof.

Generally, the Owenses bear the burden of establishing nondischargeability of a particular debt under Section 523(a) by a preponderance of the evidence.  *Grogan*, 498 U.S. at 287 ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523(a) claims by a preponderance of the evidence). Additionally, exceptions to discharge under Section 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be

resolved in the debtor's favor." *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997). *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo. Mar. 15, 2011) (same, quoting *Kaspar*).

### 3. Nondischargeability Standard.

All Section 523(a) nondischargeability claims require a two-part analysis. First, "the bankruptcy court must determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. B.A.P. 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. B.A.P. 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred"). This is referred to as the "claim on the debt" component. *Thompson*, 555 B.R. at 8. Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under § 523." *Id.*; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability"). This is referred to as the "dischargeability" component. *See Thompson*, 555 B.R. at 8 (referring to the second component as the "dischargeability claim"). There may be substantial overlap between the "claim on the debt" and the "dischargeability" components, especially with respect to allegations of fraud and misrepresentation.

## B.    Yiannos Owes a Debt to the Owenses.

As set forth in *Thompson*, 555 B.R. at 8, the first part of the nondischargeability exercise is to determine whether the bankruptcy debtor owes the creditor a valid debt. In this Adversary Proceeding, the evidence concerning the existence and amount of debt was notably thin and not particularly compelling. The Owenses paid a $171,290 Deposit to Yiannos and Murphy Creek Ranch on June 28, 2023. Per the Contract, the parties contemplated the Owenses paying a "Total Payment" of $345,910 for the whole Project. Dream Home and Yiannos performed substantial work the Project (mainly through subcontractors). Then, the Owenses terminated the Contract on October 17, 2023, halting further work by Dream Home and Yiannos. At that point, the Project was about 45-50% completed. The Owenses eventually engaged another building contractor to "fix or repair" alleged substandard work and also complete a reduced scope of the Project. They paid the substitute contractor "approximately $70,000" for the additional work to complete the reduced scope of work for the Project. However, the Owenses provided no evidence concerning the reduced scope of work which was eventually completed. So, the Court has no way to measure the reduced scope of work performed by the substitute building contractor. All the Court knows is that the Owenses paid an aggregate of $241,290 ($171,290 Deposit plus $70,000 addition to new building contractor = $241,290) for a work scope reduced from the original Project. And, the amount paid by the Owenses was also significantly below the full $345,910 price under the Contract. Put another way, the Court deduces that the Owenses eventually paid less than the Contract amount for a scope of work less than the Project scope under the Contract. Based on the foregoing, the Owenses plainly are not entitled to return of the entire $171,290 from Yiannos.

But what other evidence is there of a specific damages? In the First Spreadsheet, Yiannos asserted that Dream Home spent at least $47,167.26 on the

19

Project.  Doing a strict mathematical calculation disregarding the amount of work actually performed would suggest possible damages of $124,122.74 ($171,290 Deposit minus $47,167.26 = $124,122.74).  That is the amount the Owenses asserted in closing argument should be used to assess damages against Yiannos.

But later, in the Second Spreadsheet, Yiannos asserted that he and Dream Home incurred $138,296.96 worth of expenses, resulting in $32,993.04 as the "Amount Owed to Client."  So, Yiannos effectively confessed to owing the Owenses at least $32,993.04.  The calculation contained a $7,122 error (acknowledged by Yiannos).  Correcting the error, Yiannos has agreed that he owes the Owenses at least $40,115.04 ($32,993.04 plus $7,122 = $40,115.04) based upon the Second Spreadsheet.  However, to a large extent, the Second Spreadsheet is unsupported by contemporaneous financial records.  One of the reasons for the lack of support is that Yiannos asserts he paid most of the subcontractors in cash and he did not receive invoices or receipts.  That might partially explain the lack of records.

In any event, given the weak evidence and lack of accounting supported by documentation, the Court is left with a debt owed by Yiannos to the Owenses likely in the range between $40,115.04 (from the Second Spreadsheet) to $124,122.74 (from the First Spreadsheet).  Because of the dearth of evidence presented by both the Owenses and Yiannos, the Court is at a loss to make a more specific calculation at this time.  So, for purposes of this Memorandum Opinion, the Court determines that the Owenses likely have a debt between $40,115.04 to $124,122.74 (the "Debt") owed by Yiannos.  Making a more specific determination of damages at this stage is effectively a pointless exercise because, as explained below, whatever the amount of damages ($40,115.04 or $124,122.74 or something else), the Owenses failed to prove the nondischargeability of the Debt.

## C.   The Owenses Failed to Meet Their Burden to Prove Nondischargeability Under Section 523(a)(2)(A).

In the First Cause of Action in the Complaint, the Owenses assert that the Debt is nondischargeable under Section 523(a)(2)(A).  Section 523(a)(2)(A) contains three subparts: (1) false pretenses; (2) false representation; or (3) actual fraud.  The Court construes the Complaint as asserting two variants of Section 523(a)(2)(A) nondischargeability: (1) false representation; and (2) false pretenses.  (Compl. ¶ 31 ("As a result of the Debtor's false pretenses and false representations, Plaintiffs were damaged in an amount to be prove at trial.")).  The First Cause of Action does not mention "actual fraud."  Regardless, "[w]hile the elements for each theory [subpart] under Section 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor."  *McCarthy v. Chong (In re Chong)*, 523 B.R. 236, 244 (Bankr. D. Colo. 2014).

### 1.   False Representations.

To establish nondischargeability on grounds of false representation pursuant to Section 523(a)(2)(A), the Owenses must prove the following elements by a preponderance of the evidence:

> [1] The debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the false representation; [4] the creditor's reliance was [justifiable][10]; and [5] the false representation resulted in damages to the creditor.

*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996) (element numbering added); *see also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).  Further, the false representation must be "other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).

The Owenses have asserted two misrepresentations: (1) Yiannos told the Owenses that he was a licensed, bonded, and insured (but he was not licensed, bonded and insured); and (2) Yiannos told the Owenses that he was capable of performing the work on the Project (but he was not capable of performing the work).  During closing argument, counsel for the Owenses confirmed that those are the only alleged false representations made by Yiannos.

### a.   <u>Some of Yiannos' Representations Were False</u>.

Regarding the first Section 523(a)(2)(A) element, the Court finds that Yiannos did, in fact, make a false representation to the Owenses when he represented to the Owenses that he and/or Dream Home were "licenced [sic] insurerd [sic] and bonded." (Ex. 10.)  The evidence established that neither Yiannos nor Dream Home had any type of "license."  Furthermore, Yiannos was not a licensed general contractor authorized to obtain a building permit from the Building Department.  Similarly, neither Yiannos nor Dream Home were bonded.  However, at trial, Yiannos testified that either he or Dream Home had some type of insurance.  Dr. Owens also confirmed that Yiannos showed him a document evidencing insurance.  Although the Court did not receive a copy of any documentary evidence of insurance, based upon the foregoing, the Court finds that the Owenses failed to prove a misrepresentation by Yiannos pertaining to insurance.

The Court also agrees with the Owenses' contention that Yiannos' statement that he was capable of performing the work on the Project was a misrepresentation.  While Yiannos (then in high school) did have some construction experience prior to entering into the Contract, such experience did not encompass a major all-house remodel of the type envisioned in the Project.  The scope of the construction envisioned in the Contract was many magnitudes larger than Yiannos had ever performed in the past, and many magnitudes more costly.  Most of his experience during his four-year foray into construction (from ages 14-18) was for his friends, family, and church.  Yiannos was only a budding young builder.  So, Yiannos made two false statements: (1) that he was licensed and bonded; and (2) that he was capable of performing the Project.

---

[10]   In *Young*, 91 F.3d at 1373, the Tenth Circuit states that the reliance must be "reasonable." However, the standard is not "'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's representation."  *Riebesell*, 586 F.3d at 791.  Instead, under *Field v. Mans*, 516 U.S. 59, 74-75 (1995), the reliance must be "justifiable."

b.   **Yiannos Made Some False Representations With Intent to Deceive.**

With respect to the second Section 523(a)(2)(A) element:

> A creditor may prove intent to deceive through direct evidence
> or a court may infer intent from the totality of the
> circumstances . . . .   An intent to deceive does not mean that
> a debtor acted with a "malignant heart."  Rather, "a statement
> need only be made with reckless disregard for the truth." . . . .

*Assoc. Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 891 (Bankr. D. Colo.
2018) (citations omitted); *see also Chong*, 523 B.R. at 243 ("Intent to deceive can be
inferred from the totality of the circumstances."); *Santiago v. Hernandez (In re
Hernandez)*, 452 B.R. 709, 721 (Bankr. N.D. Ill. 2011) ("[W]here the debtor knowingly or
recklessly makes false representations that he knows or should know will induce
another to act, the court can infer an intent to deceive.").

With respect to the second element of Section 523(a)(2)(A), Yiannos knew that
neither he nor Dream Home was licensed or bonded, but made the representation that
"we are licenced [sic] insurerd [sic] and bonded."  The Court infers that the reason that
Yiannos made the representation was because he recognized that being licensed and
bonded would be important to the Owenses and concludes that Yiannos made the
misrepresentation because he thought it would lead the Owenses to believe that he was
qualified to perform the Project.  Yiannos testified that he anticipated Dream Home
would retain a licensed general contractor, such as "Michelle."  But that is not an excuse
negating the foregoing intent element.  Instead, if Yiannos' plan was to retain a qualified
licensed general contractor, he should have told the Owenses truthfully:  "I am not
licensed and bonded and so I cannot obtain a building permit from the Building
Department.  However, I plan to hire a licensed and bonded general contractor as a
subcontractor to assist in performing the work on the Project."  Yiannos did not do so.
Thus, the Owenses established an intent to deceive with respect to the objectively false
representation that Yiannos was licensed and bonded.

On the other hand, the Owenses failed to show that Yiannos intended to deceive
with respect to his statement that he was capable of performing the work on the Project.
Based on the evidence at trial, the Court concludes that Yiannos actually believed that
he was capable of completing the Project.  During high school, he had worked on
construction projections especially for his family, friends, and church.  He thought he
had performed those jobs satisfactorily.  And, he really believed he could do a major
whole-house remodeling project for the Owenses too.  In retrospect, Yiannos suffered
from overestimating his own abilities.  This should not have come as a surprise.
Teenagers often overestimate their skills and capabilities.  In any event, the Owenses
adduced no evidence proving that Yiannos himself knew he was not qualified to perform
the work in the Project and acted with improper intent.

Thus, the Court determines that Owenses proved by a preponderance of the
evidence that Yiannos acted with intent to deceive when he misrepresented that "we are

licenced [sic] . . . and bonded," but did not make such showing of intent with respect to Yiannos' representation that he was capable of performing the work on the Project.

### c. The Owenses Relied on the False Representations, But Their Reliance was Not Justifiable.

With respect to the third element of Section 523(a)(2)(A), Dr. Owens' testimony at trial proves that the Owenses relied on Yiannos' representations in entering into the Contract — but that is not enough to render Yiannos' debt nondischargeable as a matter of bankruptcy law. Section 523(a)(2)(A) requires, as its fourth element, that the Owenses also show that their reliance was justifiable. In *Young*, 91 F.3d at 1373, the Tenth Circuit indicated that the reliance must be "reasonable." However, the appellate courts later clarified that the reliance must be "justifiable." *Riebesell*, 586 F.3d at 791-92; *Field*, 516 U.S. at 74-75. Reasonable reliance and justifiable reliance are slightly different. Reasonable reliance is an objective standard based upon whether a reasonable person would have relied on the alleged false representations. Justifiable reliance is a "less demanding [standard]" than reasonable reliance. *Field*, 516 U.S. at 61; *see also Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 52 (Bankr. D. Colo. 2013), *aff'd*, 527 B.R. 416 (10th Cir. B.A.P. 2015) ("Justifiable reliance is not a high standard."); Richard Levin & Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Matthew Bender 16th ed. Supp. 2020) (justifiable reliance is "a less exacting standard" than reasonable reliance). Instead of an objective standard, justifiable reliance is a subjective standard that focuses on the "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." *Riebesell*, 586 F.3d at 792; *see also Wharton v. Flanagan (In re Flanagan)*, 2014 WL 3932647, at *7 (Bankr. D. Colo. 2014) (noting difference between "reasonable reliance" and "justifiable reliance").

Under the "justifiable" reliance test, "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Riebesell*, 586 F.3d at 792 (quoting *Field*, 516 U.S. at 71). Put another way:

> In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. . . . Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover.

*Adams Cnty. Dept. Soc. Servs. v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 n.2 (Bankr. D. Colo. 2006) (citations to *Field* omitted); *see also Chong*, 523 B.R. at 245 (same).

At trial, Yiannos presented as an unsophisticated, naïve, and inexperienced teenager. On the other hand, Dr. Owens is a highly-educated orthodontist. Because of

Yiannos' obvious youthfulness (which the Court observed first-hand during the trial), it should have been plain that Yiannos almost certainly could not have had the substantial construction, general contracting, accounting, or project management experience necessary for the Project. This should have caused the Owenses to question the veracity of Yiannos' representations regarding being licensed and bonded *before* entering into the Contract and making the $171,290 Deposit. Yet, before entering into the Contract, the Owenses did not ask Yiannos about his age or his educational background. They did not ask for evidence of Yiannos' licensure or bonding. The Owenses did not contact the Building Department to determine whether Dream Home and/or Yiannos were licensed and bonded. They failed to check any of Yiannos' references. The Owenses did not check with the Colorado Secretary of State to see how long Dream Home had been in business. They were even unsure whether they even reviewed Thumbtack reviews (from the internet application through which they located Yiannos). Based on the evidence, it appears that the Owenses only met Yiannos once before executing the Contract. The Owenses failed to prove that their reliance was in any way justifiable.

In addition to the foregoing, many other circumstances point to the Owenses' reliance being unjustifiable. The actual misrepresentation was: "We are licenced [sic] insurerd [sic] and bonded." (Ex. 10.) So, on the supposedly key issue, the Owenses were on notice that Yiannos could not even spell "licensed" and "insured." Furthermore, the Contract was a giant red flag. When the Owenses received the Contract, they should have conducted at least some cursory investigation. The Contract did not include any representations that Dream Home and/or Yiannos were licensed and bonded (the representations which the Owenses claim were so important). The Contract was grossly unprofessional. The preamble of the Contract incorrectly identified the parties and their roles. The Contract contained numerous misspellings, sentence fragments, blanks or line-spacing issues, wrong paragraph numbering, and mathematical errors. The Contract made cross-references to provisions and "Specifications" that did not exist. The Contract failed to address numerous basic features of construction contracting. Under the specific circumstances of this dispute, the Court finds that it would have been unjustifiable for the Owenses to rely on the false representation (*i.e.*, "We are licenced [sic] . . . and bonded") after being presented with the Contract.

The request for early payment of the Deposit to Yiannos and his mother's limited liability company also should have put the Owenses on inquiry notice. Even though Dream Home was the counterparty on the Contract, Yiannos asked that the Owenses pay $100,000 to him personally. Then, Yiannos also directed the Owenses to pay $25,000 to Murphy Creek Ranch. But, the Owenses made no investigation. They did not question why they were asked to pay Yiannos directly rather than Dream Home. And, they did not ask why they were directed to pay Murphy Creek Ranch, an entity about which they knew nothing. The Owenses just paid the Deposit with no inquiry.

The Court recognizes that "justifiable reliance" is a "less demanding [standard]" than reasonable reliance. *Field*, 516 U.S. at 61. "Justifiable reliance is not a high standard." *Wagner*, 492 B.R. 52. But, the Court still needs to assess "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular

case. . . ."  *Riebesell,* 586 F.3d at 792.  And, "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it."  *Riebesell,* 586 F.3d at 792.  Applying the facts under the foregoing legal standards, the Court reaches the conclusion that the Owenses failed to establish their reliance was justifiable.  They did not use their "senses."  They did not make even a "cursory examination or investigation."  They really did nothing.  Effectively, the Owenses stuck their heads in the sand and ignored that Yiannos was a high school teenager when they entrusted their $345,910 whole-house remodel to him.  They also avoided questions that should have obviously surfaced from the unprofessional high-school quality of the Contract and the payment instructions for the Deposit.  Since the Owenses' reliance was not justifiable, they failed to establish all the required elements for nondischargeability under the "false representation" part of Section 523(a)(2)(A).

### 2.   <u>False Pretenses</u>.

The Owenses also seek to establish nondischargeability on grounds of "false pretenses" pursuant to Section 523(a)(2)(A).  The statutory phrase "false pretenses" is "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."  *Munoz,* 536 B.R. at 884 n.12 (citations and internal quotations omitted).  *See also FIA Card Servs., N.A. v. Quinn (In re Quinn)*, 492 B.R. 341, 345 (Bankr. N.D. Ga. 2013) ("False pretenses is defined as '[A] series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . .'") (citations omitted).  "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions."  *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215, 223 (10th Cir. B.A.P. 2013).  Like a false representation or actual fraud claim, a claim of false pretenses also requires intentional misconduct by the debtor and justifiable reliance by the creditor.  *Field*, 516 U.S. at 74-75.

In this case, the Owenses failed to establish that Yiannos engaged in "a series of events that created a contrived and misleading understanding of the transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."  *Munoz*, 536 B.R. at 884 n.12.  In fact, the Owenses appear to rely only on the same misrepresentations already discussed: that "We are licenced [sic] insurerd [sic] and bonded."  But, other than that false representation, the Court assesses that Yiannos was quite transparent.  He did not hide his age.  He did not hide his unprofessionalism in the Text Message and the text of the Contract.  He did not hide that he was asking the Owenses to pay the Deposit to non-parties to the Contract.  He put all that out for the Owenses to see, and they failed to conduct even a cursory investigation.  The Court does not see a set of false pretenses.  In any event, even if the Owenses had met their burden to show false pretenses, they still are required to prove "justifiable reliance" on the false pretenses.  *Riebesell*, 586 F.3d at 792 (citing *Field*, 516 U.S. at 74-75).  However, they failed to do so.  For the same reasons already explained, the Owenses did not rely on their senses or engage in even a cursory investigation to examine Yiannos' licensing or bonding or other aspects of the transaction.  Therefore, the

25

Owenses are not entitled to judgment on their claim for dischargeability based on the "false pretenses" part of Section 523(a)(2)(A).  The Owenses' First Cause of Action under Section 523(a)(2)(A) fails.

**D.**      **The Owenses Failed to Meet Their Burden to Prove Nondischargeability Under Section 523(a)(4).**

In the Second Cause of Action in the Complaint, the Owenses assert that the Debt is nondischargeable under Section 523(a)(4).  Section 523(a)(4) contains three main subparts: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny.  Per the Complaint, the Owenses asserted only: "[t]he conduct of the Debtor constitutes defalcation while acting in a fiduciary capacity; and "if the evidence at trial proves that Debtor intended to convert the trust funds at the time he accepted their deposit, Debtor committed larceny."  (Compl. ¶¶ 38 and 39.)  The Second Cause of Action makes no mention of "fraud" or "embezzlement."

**1.**      **Defalcation While Acting in a Fiduciary Capacity.**

To meet the requirements of a claim for defalcation under Section 523(a)(4), the Owenses must prove: (1) the existence of an express or technical trust between them and Yiannos; (2) that Yiannos owed a fiduciary duty arising from the trust; and (3) that Yiannos breached the fiduciary duty by defalcation.  *Young*, 91 F.3d at 1371-72; *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 48 (Bankr. D. Colo. 2014).

**a.**      **Existence of a Trust and a Fiduciary Duty.**

The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law, though state law is relevant to the inquiry.  *Young*, 91 F.3d at 1371 (citations omitted); *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 786 (10th Cir. B.A.P. 1997) (quoting *Young*).  In the Tenth Circuit:

> [T]o find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor . . . .  Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4) . . . .  Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, . . . nor an inequality between the parties' knowledge or bargaining power . . . is sufficient to establish a fiduciary relationship for purposes of dischargeability.  "Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy."

*Young*, 91 F.3d at 1371-72 (internal citations omitted).

To establish the existence of a trust and Yiannos' fiduciary duty with respect to the trust, the Owenses rely upon the Colorado Trust Fund Statute, COLO. REV. STAT. § 38-22-101 *et seq*.  That statute provides, in relevant part:

> (1) All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborers or material suppliers, . . . . who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

COLO. REV. STAT. § 38-22-127.

Yiannos does not contest the existence of a trust under the Colorado Trust Fund Statute, nor that he owed fiduciary duties to the Owenses.  So, the first two elements of the Owenses' claim under Section 523(a)(4) are established.

### b.   Breach of Fiduciary Duty by Defalcation.

### i.   Standard for Defalcation.

Prior to the Supreme Court's decision in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), "the standard for defalcation in the Tenth Circuit was relatively low, requiring only 'some portion of misconduct.'"  *Cupit*, 514 B.R. at 49 (quoting *Okla. Grocers Ass'n, Inc. v. Millikan (In re Millikan)*, 188 Fed. Appx. 699, 702 (10th Cir. 2006) (unpublished)).  Bankruptcy Judge Elizabeth Brown explained:

> In the context of a claim involving construction trust funds, courts in this circuit previously [before *Bullock*] defined defalcation as "a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent.  Furthermore, the fiduciary-debtor was charged with knowledge of the law and its duties."  *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. B.A.P. 1997).  Under this definition, the creditor needed to only establish a failure to account for trust funds (the *actus reus*), without establishing any certain mental state (the *mens rea*).

514 B.R. at 49.  But in *Bullock,* 569 U.S. 267, the Supreme Court resolved a split among the circuits, clarifying the meaning of "defalcation":

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong.  We include as intentional not only

27

conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.  Thus, we include reckless conduct of the kind set forth in the Model Penal Code.  Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. . . .  That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." . . .

569 U.S. at 273-74 (internal citations omitted).

The Supreme Court further explained that "defalcation" "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase."  *Id.* at 269.  The Court described that state of mind as "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  *Id.*  Thus, the term may "encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity."  *Id.* at 275.

Judge Brown explained further on the *Bullock* standard in *Cupit*, where she explained:

> The *Bullock* standard for defalcation relies heavily on the criminal law definition for recklessness found in the Model Penal Code.  *Bullock*, [569 U.S. at 274] ("Thus, we include reckless conduct of the kind set forth in the Model Penal Code.").  This contrasts with the tort definitions the Supreme Court has applied to define terms in other subsections of § 523.  *See Field v. Mans*, 516 U.S. 59, 69 (1995) (relying on the Restatement (Second) of Torts to define the term "actual fraud" found in § 523(a)(2)).  In the case of recklessness, this distinction is important because the criminal and civil definitions of that term differ.  The test for criminal recklessness is subjective, while the tort definition is objective.  [*Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994).]  Under the civil definition, it is enough to show that the actor should have known of risk of harm his actions created.  *Id.*  For example, the Restatement (Second) of Torts' definition applies a reasonable person standard—an act is reckless if the actor has reason to know of facts which would lead a reasonable person to realize that the conduct creates an unreasonable risk of harm.  Restatement (Second) of Torts § 500.  In criminal law, liability for reckless

28

> conduct depends on a finding that the defendant "disregards a risk of harm *of which he is aware*." *Farmer*, 511 B.R. at 836-37 (emphasis added). As explained by the commentary to the Model Penal Code, recklessness "involves conscious risk creation." Model Penal Code and Commentaries § 20.02 cmt. 3, at 234. Recklessness "resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than substantial certainty; the matter is contingent from the actor's point of view." *Id.* A jury's assessment of criminal recklessness is always made "from the point of view of the actor's perceptions, *i.e.*, to what extent he was aware of risk, of factors relating to its substantiality and of factors relating to its unjustifiability." *Id.* at 238.

*Cupit*, 514 B.R. at 50. More succinctly:

> When the Supreme Court incorporated the criminal standard into the defalcation context, it specified that the risk involved is that the debtor's conduct "will turn out to violate a fiduciary duty." *Bullock*, [569 U.S. at 273]. Thus, to meet *Bullock*'s recklessness standard, there must be evidence that the debtor was subjectively aware that his conduct might violate a fiduciary duty. It is not enough that the debtor objectively should have been aware of the risk — such a finding would only support a finding of criminal negligence, not recklessness. [*People v. Hall*, 999 P.2d 207, 219-20 (Colo. 2000).]

*Cupit*, 514 B.R. at 50.

## ii. <u>The Owenses Failed to Prove Defalcation.</u>

The Owenses cite *Pritchard Concrete, Inc. v. Barnes (In re Barnes)*, 377 B.R. 289 (Bankr. D. Colo. 2007), for the proposition that "[n]egligence or the failure of a fiduciary to account for money or property entrusted to him is sufficient to establish a defalcation," *id.* at 298, and argue that, because the evidence shows that Yiannos did not properly account for all of the trust funds (*i.e.*, the Deposit), they are entitled, as a matter of law, to judgment on their claim for defalcation while acting in a fiduciary capacity under Section 523(a)(4). But, while it is true that at one time all a creditor in the Tenth Circuit who sought to establish defalcation while acting in a fiduciary capacity had to do was show a debtor's failure to account for trust funds, or negligence in the debtor's handling of trust funds, that is no longer the case after *Bullock*, which substantially changed the dischargeability landscape. *See Cupit*, 514 B.R. at 49 (discussing how in the Tenth Circuit, before *Bullock*, a "creditor needed to only establish a failure to account for trust funds (the *actus reus*), without establishing any certain mental state (the *mens rea*)" to prevail on a Section 523(a)(4) claim, and citing pre-*Bullock* case law in support of such contention). As Judge Brown noted, after *Bullock*, a

29

creditor seeking to establish nondischargeability on the basis of defalcation must show that, in failing to account for the trust funds, the debtor disregarded a risk of harm *of which he was aware* — that is, that the debtor was *subjectively* aware that his conduct might violate a fiduciary duty.  *Id.* at 50.

The evidence adduced at trial does not support a claim against Yiannos for defalcation while acting in a fiduciary capacity within the meaning of Section 523(a)(4). Yiannos was a naïve and inexperienced 18-year-old high school student when he entered into the Contract.  He had no formal training in the construction industry.  He had never managed an engagement of the scope of the Project.  In fact, he had never heard of the Colorado Trust Fund Statute and had no idea that he had fiduciary duties under that statute or a duty to properly account for the Deposit.

Should Yiannos have done more to make himself aware of his obligations before entering the Contract?  Absolutely.  Plainly, he was negligent with respect to the Deposit and failure to properly account.  If negligence or failure to properly account were the standard for the Court to apply, the Owenses might be able to prevail on their claim.  But the standard for establishing defalcation is subjective.  Yiannos simply had no knowledge about the Colorado Trust Fund Statute or any fiduciary duties thereunder. He did not know that he should be acting in a fiduciary capacity.  In reality, he knew almost nothing about the requirements for a general contractor engaging in a substantial whole-house remodeling project.  Thus, the Owenses failed to prove that Yiannos had a state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  *Bullock*, 569 U.S. at 269; *see also Cupit*, 514 B.R. 42 (rejecting Section 523(a)(4) defalcation claim for period during which debtor was unaware of the Colorado Trust Fund Statute).[11]  As such, the Court rules against the Owenses on their claim for defalcation while acting in a fiduciary capacity under Section 523(a)(4).

2.  **Larceny**.

In the Complaint, the Owenses allege as an alternative claim under Section 523(a)(4) that "if the evidence at trial proves that [Yiannos] intended to convert the trust funds at the time he accepted their deposit, [Yiannos] committed larceny.  "Larceny is 'the fraudulent and wrongful taking and carrying away of the property of another with

---

[11]     Unlike Yiannos, the defendant in *Cupit* had "extensive experience in the roofing industry and testified to participating in several trade associations and committees, and to attending numerous industry-related trainings."  514 B.R. at 52.  The defendant in *Cupit* also "wrote training curriculum for trade organizations, was a certified roof inspector and served on state licensing and building code committees," *id.* at 52-53, but still — the Court found that that was not enough to determine that the defendant consciously disregarded his fiduciary duties to a roofing supplier under the Trust Fund Statute. 514 B.R. at 53.  Indeed, the court in *Cupit* found that the defendant did not have the requisite knowledge of, and did not act with gross recklessness with respect to his fiduciary duties until such time that that he was sued by a different roofing supplier because the suit gave the defendant "awareness that there was a high probability he owed fiduciary duties . . . under the statute" and because the risk created by defendant's use of trust funds to pay oldest bills first rather than to use the funds for their intended purpose was substantial and unjustifiable.  *Id.*  Here, there is no evidence that Yiannos had actual knowledge of his fiduciary duties, nor any evidence that he had any experience that should have alerted him to his fiduciary obligations.

intent to convert the property to the taker's use without the consent of the owner.'" *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (10th Cir. B.A.P. 2015) (quoting *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, at *5 & n.39 (10th Cir. B.A.P. Feb. 2, 2011)).  "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner."  *Bombardier Cap., Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004) (quotation and citation omitted).  "The key difference between embezzlement and larceny is that '[l]arceny requires that the funds originally come into the Debtor's hands unlawfully.'"  *Tinkler*, 311 B.R. at 876 (quoting *Webber v. Giarratano (In re Giarratano)*, 299 B.R. 328, 338 (Bankr. D. Del. 2003)).

In this dispute, there is no evidence that the Deposit came into Yiannos' hands unlawfully.  To the contrary, the Owenses voluntarily wrote the checks comprising the Deposit to Yiannos and Murphy Creek Ranch.  So, for that reason alone, the Owenses' larceny claim fails.  The larceny claim also fails because, while Yiannos was negligent and failed to perform a proper accounting, there is no evidence that he intended to permanently deprive the Owenses of the benefit of the Deposit.  Instead, the Court finds that Yiannos subjectively intended to use the Deposit for the Project (and only the Project) per the Contract.  Therefore, the Owenses' claim for larceny under Section 523(a)(4) fails.

### E.   The Owenses Failed to Meet Their Burden to Prove Nondischargeability Under Section 523(a)(6).

In the Third Cause of Action, the Owenses rely on Section 523(a)(6), which makes nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge under [Section 523(a)(6)] must fail.") (emphasis in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. Jul. 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury").  Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.'  Analyzing and applying 'willful' and 'malicious' separately is the better approach."  *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. B.A.P. 2020) (emphasis in original).

According to the Supreme Court, to satisfy the willful injury part of Section 523(a)(6), the Owenses must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).  The focus is whether a debtor acted with the "actual intent to cause injury."  *Id.*  "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury.  *Id.*  Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Id.* at 64.  Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the
> category "intentional torts," as distinguished from negligent
> or reckless torts.  Intentional torts generally require the actor
> to intend "the *consequences* of an act," not simply "the act
> itself."

*Id*. at 61-62 (emphasis in original, citation omitted).

To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur."  *Smith*, 618 B.R. at 912.  *See also Moore,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it'") (brackets and ellipses in original, citation omitted); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Moore* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, at *3 (10th Cir. 2020) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur").  It is a subjective standard.  *Smith*, 618 B.R. at 912.

For the same reasons discussed above, the Court finds that Yiannos, subjectively, did not wish to cause injury or believe injury would be substantially certain to occur as a result of his actions or inactions.  Yiannos intended no harm, and, in fact, believed he could complete the Project.  But Yiannos was a teenager who simply did not know enough to realize that he had to carefully account for the money entrusted to him, nor that he needed to take steps to ensure that all of it was used for the Project, nor that he lacked the skill to perform the services required of a general contractor overseeing the Project.  Yiannos may have injured the Owenses through his negligence and owes the Debt to them as a result; but he did not act with the requisite subjective intent such that the Debt is nondischargeable as a willful injury under Section 523(a)(6).

The Court also examines the malicious injury requirement.  The standard for "malicious" injury is different than "willful" injury.  Something else is required.  But what?  The most recent binding appellate decision on Section 523(a)(6) puts it this way:

> [M]alicious injury requires "evidence of the debtor's motives."
> *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020)
> (quotation marks omitted).  To be malicious, the debtor must
> have "acted with a culpable state of mind vis-à-vis the actual
> injury caused the creditor."  *Id*. (quotation marks omitted).
> The malicious injury requires that the action be "wrongful
> and without just cause or excuse."  *Id*.

*Bloom*, 2022 WL 2679049, at *7.  *See also Smith*, 618 B.R. at 919.  The Tenth Circuit also explained:

32

> [P]ersonal animus is not a requirement for malicious injury.
> *Smith*, 618 B.R. at 919 (describing the requirements for
> malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d
> 66, 69 (2d Cir. 2006) (explaining malicious injury means
> "wrongful and without just cause or excuse, even in the
> absence of personal hatred, spite, or ill-will (quoting *In re
> Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)).

*Bloom*, 2022 WL 2679049, at *7. So, malice can be shown if the injury was wrongful and inflicted "without just cause or excuse." *Wagner*, 492 B.R. at 55 (emphasis omitted); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at *6 (Bankr. D. Colo. Aug. 12, 2014) (same). In assessing the presence or absence of "malicious injury," the totality of the circumstances must be examined. *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993) ("all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind" under Section 523(a)(6)); *Smith*, 618 B.R. at 919-20 (quoting *Pasek*'s "all the surrounding circumstances" language; and examining "the totality of the circumstances . . . to determine if a wrongful state of mind was present" and whether the debtor committed malicious injury).

The Court has considered the totality of the circumstances and concludes that Yiannos did not commit malicious injury. Dream Home and Yiannos breached the Contract. Yiannos may have been negligent as well with his failure to conduct a proper accounting of the use of the Deposit. However, he had no animosity toward the Owenses. He liked and respected them. Yiannos' misconduct can be easily explained: he really did not know what he was doing. The Owenses failed to prove that Yiannos maliciously injured them under Section 523(a)(6).

## F.    The Court Denies the Motion to Reconsider.

During closing argument at the trial, counsel for the Owenses made an oral motion under Fed. R. Civ. P. 37 (made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7037) for the Court to make a negative inference that that the Second Spreadsheet (Ex. 8) was inaccurate. Counsel for the Owenses suggested that Yiannos had committed unspecified discovery violations related to the production of documents. The Court denied the oral motion because the Owenses had made an untimely request during closing argument without any details and failed to provide the Court with any supporting case law.

After the conclusion of the trial, the Owenses filed "Plaintiffs' Motion for Relief from Order Re: Debtor's Failure to Preserve, Account, and Produce." (Docket No. 35, the "Motion to Reconsider"). Yiannos opposed the Motion to Reconsider. (Docket No. 38.) In the Motion to Reconsider, under the heading "Standard of Review," the Owenses set forth the standard for evaluating motions for reconsideration citing *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) and in *U.S. ex rel. Superior Steel Connectors Corp. v. RK Specialties Inc,* 2012 WL 3264296 (D. Colo. Aug. 10, 2012). As best the Court understands, the Motion to Reconsider is premised

33

on Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b), both of which are discussed in *Servants of the Paraclete*.

Fed. R. Civ. P. 59(e) provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." And Fed. R. Civ. P. 60(b)(1) states: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . ." But the Federal Rules of Civil Procedure do not contemplate motions to reconsider interlocutory orders. *See*, *e.g.*, Fed. R. Civ. P. 59(e) (providing for motions to alter or amend a *judgment*); Fed. R. Civ. P. 60(b) (specifying that this rule applies only to "a *final* judgment, order, or proceeding"). The Court denied the oral motion without prejudice to the Owenses' later presenting the motion in writing, complete with citation to legal authority and record evidence. So, there is no basis in the Federal Rules of Civil Procedure for "reconsideration" of the order denying the oral motion made during closing argument at the trial. Thus, the Court denies the Motion to Reconsider to the extent it seeks "reconsideration" of the ruling made at trial.

But aside from the procedural deficiency, the Court also has tried to ascertain the underlying basis for the Motion to Reconsider and relief requested. The Court assesses that the Motion to Reconsider is not at all a model of clarity. As best the Court can understand, the Owenses quarrel with the Second Spreadsheet (Ex. 8). At the end of the Motion to Reconsider, the Owenses asked for the following relief:

> And, if and when this Motion is granted, Plaintiffs presented uncontested evidence that Debtor owes Plaintiffs $124,122.74 in unaccounted for Project Costs, or in the alternative the $40,144.96 admittedly "owed to client" plus treble damages and attorneys' fees.

(Docket No. 35 at 20.) That seems more like an argument than a request for relief. In any event, however, earlier in the Motion to Reconsider, the Owenses stated:

> Debtor should have been sanctioned with the negative inference Plaintiffs requested in the oral motion — i.e., the inference that, had the Debtor produced bank records during discovery, they would not have supported the additional $91,129.70 in Project Costs in Tr. Ex. 8 [Second Spreadsheet] (compared to Tr. Ex. 7 [First Spreadsheet]. At a minimum, Debtor should have been sanctioned with the negative inference that, had he produced bank records during discovery, they would not have supported the unspecified amounts that were not identified in Tr. Exs. 7 or 8 and that Debtor attempted to use to cancel out the $32,993.04 admittedly "owed to client" . . . . The Motion should be granted (and the Court's ruling on Plaintiffs' oral motion for commensurate sanctions reversed) to correct a clear error of law and avoid a manifest injustice, and to

34

> ensure Debtor is held accountable for his failure as an
> admitted fiduciary to preserve, account, and produce.

(Docket No. 35 at 18.)  So, the Owenses apparently want the Court to discount the Second Spreadsheet and instead endorse the First Spreadsheet for damage calculations.  Alternatively, the Owenses propose that the Court use the Second Spreadsheet.

The foregoing seems exceedingly strange since it was the Owenses themselves who asked for the Court to admit the Second Spreadsheet (Ex. 8) into evidence.  With no objection raised by Yiannos, the Court admitted the Second Spreadsheet.  And, then, counsel for the Owenses engaged in extensive questioning of both Dr. Owens and Yiannos about the Second Spreadsheet.  If the Owenses had not introduced the Second Spreadsheet and asked so many questions about it, it seems unlikely that the issue they now complain about (*i.e.*, the Second Spreadsheet should not be considered accurate) ever would have surfaced.  In any event, as the Court already has noted in this Memorandum Opinion, "Yiannos did not provide any documentary support with the Second Spreadsheet (although a subset of the transactions listed on the Second Spreadsheet had been identified earlier in the Initial Spreadsheet for which some documentary support was provided)."  So, the Court already has recognized the Second Spreadsheet is not fully supported, which seems to be the type of sanction the Owenses want the Court to impose.  Furthermore, by introducing the Spreadsheet themselves, the Owenses have waived entitlement to the type of relief they now seek.

Irrespective of all the foregoing, however, the Court denies the Motion to Reconsider also because it is effectively moot.  The Owenses want the Court to accept a damages figure of $124,122.74 based on the First Spreadsheet as a sort of sanction.  However, earlier in this Memorandum Opinion, the Court ruled:

> [G]iven the weak evidence, the Court is left with a debt owed
> by Yiannos to the Owenses likely in the range between
> $40,115.04 (from the Second Spreadsheet) to $124,122.74
> (from the First Spreadsheet).  Given the dearth of evidence
> presented by both the Owenses and Yiannos, the Court is at
> a loss to make a more specific calculation at this time.  So,
> for purposes of this Memorandum Opinion, the Court
> determines that the Owenses likely have a debt between
> $40,115.04 to $124,122.74 (the "Debt") owed by Yiannos.
> Making a more specific determination of damages at this
> stage is effectively a pointless exercise because, as
> explained below, whatever the amount of damages
> ($40,115.04 or $124,122.74 or something else), the
> Owenses failed to prove the nondischargeability of the Debt.

The Court need not engage in a pointless and untimely sanction which ultimately pertains to the amount of damages because the Owenses failed to prove the dischargeability of *any debt* under Sections 523(a)(2)(A), (a)(4) and (a)(6).  So, the Court denies the Motion to Reconsider.

## VI.    <u>Conclusion and Orders</u>.

For the reasons set forth above, the Court ORDERS as follows:

1. Judgment shall enter favor of Yiannos and against the Owenses on all causes of action asserted in the Complaint.

2. The Motion to Reconsider is denied.

Dated this 17th day of July, 2025.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara
United States Bankruptcy Judge